[Cite as *State v. Hawk*, 2021-Ohio-4533.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 21AP-265 |
| | | (C.P.C. No. 11CR-5746) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Jyshonne D. Hawk, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 23, 2021

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Mark R. Wilson*, for appellee.

**On brief:** *Jyshonne D. Hawk*, pro se.

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Jyshonne D. Hawk, pro se, appeals from a decision and entry of the Franklin County Court of Common Pleas denying his motion for leave to file a motion for new trial. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed October 31, 2011, plaintiff-appellee, State of Ohio, charged Hawk with one count of attempted murder in violation of R.C. 2923.02 as it relates to 2903.02, a first-degree felony; and four counts of felonious assault in violation of R.C. 2903.11, second-degree felonies. All five counts in the indictment contained accompanying firearm specifications in violation of R.C. 2941.145.

{¶ 3} The matter proceeded to a jury trial. In *State v. Hawk*, 10th Dist. No. 12AP-895, 2013-Ohio-5794, this court summarized the evidence produced at trial as follows:

According to the state's evidence, in early October 2011, Delilah Collier ("Delilah") and her common-law husband, Cleophus Rumph-Holiday ("Cleo"), moved into one side of a double located at 1507 Duxberry Avenue ("1507 Duxberry") in Columbus, Ohio, along with their children, 15-year-old S.K., 8-year-old M.H., and 11-month-old C.R. A porch extending between 1507 Duxberry and the other side of the double, located at 1505 Duxberry Avenue ("1505 Duxberry"), is separated only by a metal railing.

At approximately 11:30 p.m. on October 12, 2011, Delilah, Cleo, and S.K. were seated on the front porch of their house, listening to music. Police officers arrived and reported they had received a complaint of loud music and that someone on the porch was holding a gun. After finding no gun, the police admonished the group to turn down the music and then left. Shortly thereafter, Delilah's nephew, Darrick Jordan, joined the group on the porch.

At approximately the same time, a woman named Brenda Peck, who lived across the street at 1510 Duxberry Avenue ("1510 Duxberry"), but at the time was sitting on the front porch of a double just east of 1507 Duxberry, shouted at Delilah to turn down the music. Delilah accused Brenda of calling the police, and the two women exchanged heated words. To avoid further confrontation with Brenda, Delilah went to an internet café with Cleo, Darrick, and the children.

The group returned to 1507 Duxberry sometime before 1:00 a.m. on October 13, 2011. Cleo and the children went inside the house; Delilah and Darrick sat on the front porch smoking cigarettes. Delilah and Darrick observed a light-skinned African-American man emerge from the front door of the house at 1510 Duxberry, holding what Delilah described as a "long gun." (Tr. 55.) According to Delilah, the man shouted "[w]ho in the fuck has a problem with me and my baby's mom over here." (Tr. 57.) As the man continued to shout, persons from inside 1510 Duxberry wrestled the gun from him and pulled him into the house.

Moments later, the light-skinned man exited 1510 Duxberry, removed his jacket and shirt, and ran into the street. A dark-skinned African-American man wearing a hoodie sweatshirt walked to the bottom of the stairs at 1507 Duxberry and averred he had been trying to calm the light-skinned man. The light-skinned man then ran onto the front porch at 1505

Duxberry and began arguing with Darrick. Hearing the argument, Cleo and S.K. came out of the house. The light-skinned man began shouting at Cleo and attempted to strike him. Cleo struck the man in retaliation.

According to Delilah, the light-skinned man then removed a gun from his back pocket, fired several shots as he ran down the stairs from the porch, and ran away. S.K. and Darrick testified that the light-skinned man ran from the porch to the front yard after being struck by Cleo. Darrick, S.K., and Cleo all testified that they did not actually see a gun in the man's hands when shots were fired. However, Darrick testified that he heard gunshots, and Cleo and S.K. testified that they saw "fire," coming from the front yard where the man was standing. (Tr. 179, 242.)

Both Delilah and S.K. averred that the dark-skinned man ran from the front porch around the side of the house toward the back yard when the gunfire began. Both testified that the dark-skinned man did not fire the shots.

Cleo was struck in the mid-section by multiple bullets and sustained serious injuries. Delilah, Darrick, and S.K. were also shot. Thereafter, the four victims ran inside the house. Cleo dialed 911, and Delilah reported to the police dispatcher that she and several others had been shot by "people across the street." (Tr. 84, exh. No. 33 (CD of 911 call.)) According to Delilah, the group retreated to the back of the house because they heard several gunshots outside.

Columbus Police Officer Zachary Rosen was dispatched to the scene at approximately 12:55 a.m.; he arrived less than a minute later. He was directed to the scene by some people standing outside a house located at 1501 Duxberry Avenue ("1501 Duxberry"). When Officer Rosen arrived at 1507 Duxberry, he pounded on the door for a minute or two; when no one answered, he kicked in the door to gain entry. Inside the house, he found four individuals who had sustained gunshot wounds. The shooting victims were thereafter transported to various hospitals.

The police interviewed Delilah at the hospital. At trial, Delilah admitted that during this interview, she spontaneously stated that she did not see a gun in the light-skinned man's hand. She attributed this statement to the fact that she was traumatized

by the shooting and was taking pain medications. She admitted, however, that during the same interview, she correctly recounted several other details of the shooting. She averred at trial that she presently remembered seeing the light-skinned man remove a gun from his back right pocket and fire several shots.

Columbus Police Detective Randy Vanvorhis interviewed Brenda Peck after the shooting and she consented to a search of 1510 Duxberry. During that search, police recovered an empty rifle case and an empty handgun case from the basement, ammunition from one of the bedrooms, and a baggie containing .22 caliber ammunition from the front yard. During a search of 1507 Duxberry, no guns or ammunition were recovered; however, spent shell casings were recovered from both the front porch and front yard. Detective Vanvorhis admitted that the police did not request expert analysis regarding bullet trajectory or fingerprint analysis of the shell casings recovered from 1507 Duxberry.

Detective Vanvorhis eventually developed appellant as a suspect, and generated two photo arrays which included appellant's photograph. Because appellant had no criminal record at the time of the incident, the photograph used in the first array was taken from the LEADS database. This photo array was presented to Delilah and S.K. Delilah unequivocally identified appellant as the light-skinned African-American man who fired the shots on October 13, 2011. In the "Viewer's Statement" portion of the document accompanying the photo array, Delilah wrote "Photo number two [appellant] looks just like the person who came to my home and shot me and my family." (State's exh. No. 41(A)). S.K. circled appellant's picture in the photo array, but candidly admitted at trial that he told the police immediately after identifying appellant that he "[did not] know if that's him." (Tr. 186.) In the "Viewer's Statement" portion of the document accompanying the photo array, S.K. wrote "I thought it was photo #2 [appellant] but that's not the right person." (Tr. 186.) S.K. testified at trial, however, that there was only one light-skinned African-American man involved in the incident and that he was certain the dark-skinned man did not fire the shots.

The second photo array, which included a mug shot of appellant following his arrest, was presented to Darrick and Cleo. Darrick was unable to identify appellant as the shooter. At trial, Darrick averred he told the police he could not make

an identification because the shooter "had * * * fuller facial hair and he was high yellow." (Tr. 145; State's exh. No. 43A.) Cleo first identified a photograph of someone other than appellant as the shooter, but indicated he was only 50 percent certain of the identification and wanted to look at the photographs again "because they look[ed] alike." (State's exh. No. 44(A.)) Cleo then selected appellant as the shooter and indicated he was "100% sure." (State's exh. No. 44A.) He wrote in the "Viewer's Statement" portion of the document accompanying the photo array that "[#]5 [appellant] shot me on 13th." (State's exh. No. 44A.)

A few days before trial, S.K. identified a photograph of Jywaun Yoest, appellant's half-brother, as the dark-skinned African-American man present at the scene on October 13, 2011. At trial, Delilah, Cleo, Darrick, and S.K. all identified appellant as the person who shot them. Both Darrick and S.K. unequivocally testified that the dark-skinned man was not the shooter; rather, it was the light-skinned man.

Three additional witnesses, Verlin Peck, Shea Wade, and Nicole Wade testified about the events of October 12 and 13, 2011 as part of the state's case-in-chief. Verlin testified that he resided at 1510 Duxberry with his daughter, Brenda Peck, her children, and the children's father, appellant. Sometime after midnight on October 13, 2011, Verlin was inside 1510 Duxberry performing household chores when he heard appellant run up and down the stairs. Thereafter, Brenda told Verlin that appellant had taken a .22 rifle outside. Appellant's mother, Jeanetta Yoest, who lived next door at 1512 Duxberry, retrieved the rifle from appellant, unloaded it, and handed it to Verlin. Verlin examined the rifle to ensure it contained no shells and then stored it in the basement. Soon thereafter, Brenda ran into the house, closed the front door, and reported that appellant had been in a fight outside and that "shots had occurred." (Tr. 286-87.) Verlin told her that she should get away from the door and protect her children.

At some point after the shootings, police took Verlin to the police station for questioning. Verlin told the police that Brenda told him that "Shonne shot a gun." [("Shonne" is nickname for Hawk.)]   (Tr. 290.) The police performed a gunshot residue test on Verlin's hands, which revealed particles "highly indicative of a gunshot primer residue," and that such was consistent with a person having just discharged a firearm, having been in the vicinity of a firearm upon

discharge, or having handled an item with gunshot primer residue on it. (Tr. 288, State's exh. No. 40.)

At trial, Verlin admitted he did not see who fired the gunshots and did not even hear any gunshots being fired outside. He denied firing a weapon on October 13, 2011.

At the time of the incident, Shea and Nicole Wade lived at 1501 Duxberry. Both were seated on their front porch and saw the neighbors at 1510 Duxberry wrestle a long gun away from appellant. According to the Wades, appellant did not go back inside 1510 Duxberry after the gun was taken away; rather, he immediately began arguing with the residents of 1507 Duxberry. He then walked toward the Wades and asked Shea whether he would confront a person who had been disrespectful to the mother of his child. When Shea responded affirmatively, appellant walked up on the porch at 1505 Duxberry. One of the men at 1507 Duxberry punched appellant, and he fell backward on the porch. Shea then heard several gunshots and saw appellant run away.

According to Shea, appellant was wearing only sweatpants with red shorts underneath at the time of the shooting. He did not think appellant was the shooter because he did not see appellant with a gun, the gunshots began immediately after appellant was punched and fell down on the porch, and the shots came from the front yard and continued after appellant ran away from the scene. Although Shea admitted that he would not have been able to see a gun in the pocket of appellant's sweatpants, he averred that he did not think appellant had a gun in his pocket because his sweatpants were not "sagging." (Tr. 340.) Shea further testified that he told the police during interviews on October 24 and November 7, 2011 that appellant could not have been the shooter.

Nicole testified that after the shots were fired, she heard someone shout, "it was Shonne, it was Shonne." (Tr. 368.) Nicole thought the person was mistaken because she did not see appellant with a gun when he was talking to Shea and she did not believe appellant would have had time to fire a gun after he was punched and fell backward on the porch. Nicole averred that she told police in an interview on November 15, 2011 that appellant could not have fired the shots because they came from the front yard of 1507 Duxberry and he was standing on the porch of 1505 Duxberry at the time. She further averred that she told a defense investigator in May or

June 2012 that she observed an African-American male wearing dark clothing exit 1510 Duxberry and try to defuse the situation between appellant and the people at 1507 Duxberry. Nicole admitted that she saw no one other than appellant arguing with the residents of 1507 Duxberry, and that appellant was "upset" and "out of * * * control" during the incident. (Tr. 389.)

Appellant was arrested on October 21, 2011. On December 2, 2011, the police recovered a firearm from an abandoned house located at 260 South Fourth Street. A test fire of that firearm established its operability, and comparison of spent shell casings from the test fire with information obtained from a national ballistics database revealed a match with shell casings recovered from both the October 13, 2011 shooting and a shooting on November 8, 2011. Police did not request fingerprint analysis of the gun recovered on December 2, 2011.

Several witnesses, including appellant, testified on appellant's behalf. According to these witnesses, at the time of the incident, Brenda and Jeanetta were sitting with Mona Lisa Conley and her minor grandchildren, T.J. and Q.C., on the front porch of Lisa's house at 1511 Duxberry. Following the argument between Brenda and Delilah, appellant and Jywaun arrived at Lisa's house. According to Lisa, an African-American man emerged from 1507 Duxberry and stared at the group seated on Lisa's porch; Lisa admonished Jywaun not to say anything to the man. Appellant and Jywaun then left Lisa's house. Appellant walked across the street to his house. As Jywaun walked away, he slipped on the steps; Jeanetta, Lisa, and T.J. observed a black-handled gun protruding from his right pocket. Jeanetta was not surprised Jywaun had a gun because he had carried one with him for several years.

A short time later, appellant exited his house carrying a "long gun." (Tr. 518.) Jeanetta left Lisa's porch and walked over to help Brenda and Verlin get the rifle away from appellant. Jeanetta testified she did so because she knew he was angry about the confrontation between Brenda and Delilah and she was afraid of what he would do with a gun. Appellant eventually went back into the house, but emerged a short time later and walked onto the porch at 1505 Duxberry. Jeanetta followed appellant because she wanted to stop him from fighting with the neighbors. According to Jeanetta, appellant did not have a gun at this point.

At the same time, Jywaun walked to the bottom of the steps at 1507 Duxberry and attempted to mollify the situation between the neighbors and appellant. According to both T.J. and Lisa, Delilah went inside her house and emerged with what they believed to be a gun and handed it to one of the men on the porch. Lisa testified that she heard the sound of a gun click at 1507 Duxberry and went inside her house. She heard gunshots immediately thereafter, but did not see who fired the shots.

According to T.J. and Jeanetta, Cleo hit appellant while appellant was standing on the porch at 1505 Duxberry. Jeanetta testified that after Cleo hit appellant, she saw Jywaun standing in the front yard with his arm extended and a gun in his hand, firing several shots. T.J. testified that although he did not actually see Jywaun pull the trigger, he "seen the gunfire come from the spot [Jywaun] was standing." (Tr. 555.) T.J. was certain that Jywaun fired the gun, and that no shots were fired from the porch at 1505 Duxberry. Q.C. confirmed T.J.'s testimony that Jywaun was standing at the bottom of the steps at 1505 Duxberry when the shots were fired. Q.C. testified that he did not actually see Jywaun fire a weapon; however, he observed the flash of a gun from the spot where Jywaun was standing. Both appellant and Jywaun then ran from the scene.

Immediately after the shooting, Lisa heard her neighbor, Trish, yell "Shonne, you did this, this is your fault. Shonne, ain't nobody done this but you, Shonne." (Tr. 526-27.) When the police arrived, she overheard Delilah report that "the white guy Shonne across the street did it." (Tr. 527.)

Lisa, T.J., Q.C., and Jeanetta testified that they did not immediately inform the police about what transpired on October 13, 2011 because they were distrustful of the police. Lisa and T.J. first recounted their versions of the events to a defense investigator in May 2012. After appellant was arrested, Jeanetta told Jywaun he should tell the police he was the shooter. Jeanetta admitted that she not tell the police that Jywaun was the shooter until June 2012.

Appellant testified that he and Jywaun returned to the Duxberry Avenue neighborhood late on October 12, 2011 after drinking at a friend's house. The two men joined Brenda, Jeanetta, and Lisa on Lisa's front porch. After smoking marijuana, appellant walked to his house with Brenda. Brenda told him that the neighbors at 1507 Duxberry Avenue had

been "rude and nasty" to her, calling her names and accusing her of calling the police on them. (Tr. 590.) Appellant was immediately angry and left his house to confront the neighbors. When he challenged Delilah about her argument with Brenda, Delilah threatened to have her boyfriend beat him up.

Appellant returned to his house and retrieved a .22 rifle from upstairs because he "had an attitude" and he knew the people at 1507 Duxberry had guns and shot them every day. (Tr. 591.) According to appellant, the rifle was not loaded; however, he put a baggie of .22 caliber ammunition in his jacket pocket on the way out the door. Jeanetta, Brenda, and Verlin wrestled the rifle away from him.

Appellant then ran into the street and started arguing with Cleo, who was standing in the doorway of 1507 Duxberry. While he was arguing with Cleo, Darrick walked down the steps from the porch and stood near Jywaun. Because he thought Darrick wanted to fight him, appellant removed his jacket and placed it on the ground near his front yard. As he did so, the baggie of bullets fell out of the pocket.

Appellant then walked to the Wades' front yard and asked Shea what he would do if someone made disrespectful comments to the mother of his child. When Shea responded that he would confront such a person, appellant walked onto the porch at 1505 Duxberry and continued to argue with Cleo. Cleo punched appellant, and appellant immediately saw a "flash" coming from the front yard, near the area where Jywaun and Darrick had been standing. (Tr. 599.) Appellant assumed he was the target of the shooting, so he ran away.

As he was running, he noticed Jywaun running behind him in the same direction. Jywaun told him that he fired the shots because the people at 1507 Duxberry had a gun and were going to shoot him and appellant. When appellant returned to his house about an hour later, he saw the police canvassing the neighborhood. He did not tell the police what had happened because he was afraid to do so.

Appellant later learned that the police were looking for him, and he attempted, albeit unsuccessfully, to contact them. Following his October 21, 2011 arrest, he provided a statement to the police. He did not tell the police that Jywaun had fired

> the shots because Jywaun is his brother and appellant did not fully understand that he was being charged with a crime.
>
> Appellant acknowledged that he and Jywaun have easily distinguishable skin tones—appellant is light-skinned, while Jywaun is dark-skinned. Appellant denied that he was armed with another gun after the rifle was taken away from him, and averred that he did not believe he needed a gun because he knew Jywaun was carrying one. He admitted that Jywaun and Darrick were not arguing with one another, and that Jywaun was not the one who was "outraged" and "out of control." (Tr. 616.) He denied firing the shots on October 13, 2011.
>
> On June 22, 2012, Detective Vanvorhis received a telephone call from a person who identified himself only as appellant's brother; the call was audiotaped. Appellant identified the voice on the audiotape as that of Jywaun. The audiotape was played for the jury at trial. The transcript of the call establishes that the caller stated he had committed the crimes with which appellant had been charged, and that he wanted to turn himself into the police, "but only if my brother is for sure that he can get out." (Tr. 670.) According to Detective Vanvorhis, the caller never provided a statement in person.

*Hawk* at ¶ 2-36.

{¶ 4} Following deliberations, the jury found Hawk guilty of all five charges. The trial court sentenced Hawk to an aggregate term of 40 years in prison, journalizing his convictions and sentence in an October 3, 2012 judgment entry. Hawk appealed, arguing, as relevant here, that his convictions were against the manifest weight of the evidence. In a December 31, 2013 decision, this court affirmed Hawk's convictions, concluding the manifest weight of the evidence supported Hawk's convictions of attempted murder and felonious assault. *Hawk* at ¶ 63-65.

{¶ 5} Nearly seven years after the date of his conviction, on September 26, 2019, Hawk filed a motion to void the judgment and requested leave to file a delayed motion for new trial ("first motion for leave"). In his first motion for leave, Hawk argued the state withheld exculpatory evidence in the form of documentation of Jywaun's arrest. Hawk asserted the evidence demonstrated that Jywaun had surrendered to Detective VanVorhis after calling the detective and admitting his own guilt in the shootings. In support of his first motion for leave, Hawk filed Jywaun's affidavit ("Jywaun's first affidavit"), dated

September 2, 2016, more than three years before the date of Hawk's motion for leave. Hawk also filed a printout from the Franklin County Municipal Court's website for case No. 2012CRA-015404 indicating that Jywaun had been arrested on June 22, 2012, listing the complaining officer as Detective VanVorhis, and indicating the case was dismissed on June 26, 2012. However, the municipal court printout mistakenly listed the offense date as November 11, 2011, though Hawk did not note the mistaken date in his first motion for leave. Hawk argued that the municipal court arrest record proves that Detective VanVorhis perjured himself when he testified that Jywaun never provided an in-person statement to police. The state opposed Hawk's first motion for leave to file a delayed motion for new trial.

{¶ 6} In a November 7, 2019 judgment entry, the trial court denied Hawk's first motion for leave to file a delayed motion for new trial. The trial court found that Hawk could not show by clear and convincing evidence that he was unavoidably prevented from discovering the evidence of Jywaun's arrest record within the 120-day deadline. Specifically, the trial court noted that Jywaun is Hawk's brother and was present at trial, although Jywaun invoked his Fifth Amendment right against self-incrimination at trial. Further, the trial court provided alternative grounds to deny Hawk's first motion for leave: the trial court noted that even if it were to find that Hawk was unavoidably prevented from discovering the evidence of Jywaun's arrest within the 120-deadline, the arrest record indicates an arrest for an offense date of November 11, 2011, nearly one month after the October 13, 2011 date of Hawk's offenses, and thus was not evidence that Jywaun ever made an in-person statement relevant to Hawk's charged offenses. Finally, the trial court noted that the arrest record, itself, is not proof that Jywaun ever made an in-person statement to Detective VanVorhis, and Jywaun's first affidavit states only that he tried to turn himself in, was arrested and jailed, and then released. Jywaun's first affidavit does not contain any statement that he was interviewed about Hawk's crimes or ever made an in-person statement to Detective VanVorhis. Hawk did not appeal the trial court's denial of his first motion for leave.

{¶ 7} On March 23, 2021, more than 16 months after the trial court denied his first motion for leave, Hawk filed another motion for leave to file a delayed motion for new trial ("second motion for leave"). In his second motion for leave, Hawk again argued the state

withheld exculpatory evidence of Jywaun's arrest for the same offenses and that he was unavoidably prevented from discovering the evidence of that arrest within the Crim.R. 33 time frame. Attached to his second motion for leave, Hawk filed copies of Jywaun's municipal court case, including (1) a June 22, 2012 criminal complaint charging Jywaun with felonious assault, (2) a notification of need to amend the complaint to reflect the proper offense date of October 13, 2011, (3) a June 26, 2012 motion to dismiss pending felony signed by the prosecutor, (4) a June 26, 2012 entry dismissing the case against Jywaun, and (5) a media request from WBNS-TV to record, videotape, and broadcast the proceedings in Jywaun's case. Additionally, Hawk filed his own affidavit dated March 15, 2021, a December 11, 2020 affidavit from his friend, Danika Wickham, and a second affidavit of Jywaun, dated February 1, 2021. The state opposed Hawk's second motion for leave.

{¶ 8} In an April 26, 2021 decision and entry, the trial court denied Hawk's second motion for leave, finding Hawk's motion not well-taken. Hawk timely appeals.

## II. Assignment of Error

{¶ 9} Hawk assigns the following error for our review:

> The trial court abused its discretion by denying Hawk's Crim 33(B) motion for leave to file a delayed motion for new trial, as the context of the "not well taken" decision is contrary to the United States Supreme Court preceident set forth in Banks v. Dretke.

(Sic passim.)

## III. Analysis

{¶ 10} In his sole assignment of error, Hawk argues the trial court abused its discretion in denying his motion for leave to file a delayed motion for new trial.

{¶ 11} An appellate court reviews a trial court's decision granting or denying a Crim.R. 33 motion for new trial for an abuse of discretion. *State v. Townsend*, 10th Dist. No. 08AP-371, 2008-Ohio-6518, ¶ 8, citing *State v. Schiebel*, 55 Ohio St.3d 71, 76 (1990). Similarly, we will not disturb a trial court's decision granting or denying a Crim.R. 33(B) motion for leave to file a delayed motion for new trial absent an abuse of discretion. *Townsend* at ¶ 8, citing *State v. Pinkerman*, 88 Ohio App.3d 158, 160 (4th Dist.1993). An

abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 12} Hawk premised his motion for new trial on newly discovered evidence that he alleges demonstrated misconduct on the part of the prosecution and witnesses for the state. Crim.R. 33 provides, in pertinent part:

> (A) Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
>
> * * *
>
> (2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;
>
> * * *
>
> (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial.
>
> * * *
>
> (B) Motion for new trial; form, time.
>
> Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.
>
> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably

prevented from discovering the evidence within the one hundred twenty day period.

{¶ 13} Thus, Crim.R. 33(B) contemplates a two-step procedure when a defendant seeks to file a motion for new trial outside either the 14-day deadline for motions filed under Crim.R. 33(A)(2) or the 120-day deadline for motions filed under Crim.R. 33(A)(6). In the first step, the defendant must demonstrate that he was unavoidably prevented from discovering the evidence relied upon to support the motion for new trial. *State v. Bethel*, 10th Dist. No. 09AP-924, 2010-Ohio-3837, ¶ 13; *State v. Gaven*, 10th Dist. No. 16AP-645, 2017-Ohio-5524, ¶ 13, 17. In the second step, if the trial court finds unavoidable prevention by clear and convincing evidence, then the defendant must file the motion for new trial within seven days from the trial court's order. *Bethel* at ¶ 13; *Gaven* at ¶ 13, 17.

{¶ 14} A defendant demonstrates he was unavoidably prevented from discovering the new evidence within the time period for filing a motion for new trial when the defendant "had no knowledge of the evidence supporting the motion for new trial and could not have learned of the existence of the evidence within the time prescribed for filing such a motion through the exercise of reasonable diligence." *Bethel* at ¶ 13, citing *State v. Berry*, 10th Dist. No. 06AP-803, 2007-Ohio-2244, ¶ 19. "Clear and convincing proof that the defendant was unavoidably prevented from filing requires more than a mere allegation that a defendant has been unavoidably prevented from discovering the evidence he seeks to introduce as support for a new trial." (Internal quotations and citations omitted.) *State v. Lee*, 10th Dist. No. 05AP-229, 2005-Ohio-6374, ¶ 9. "The standard of 'clear and convincing evidence' is defined as that measure or degree of proof that is more than a mere preponderance of the evidence, but not to the extent of such certainty that as is required beyond a reasonable doubt in criminal cases, and that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Townsend* at ¶ 7, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 15} In order to warrant the granting of a motion for new trial in a criminal case based on newly discovered evidence, the defendant must show that the new evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely

cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505 (1947), syllabus. *See also Lee* at ¶ 9. In his motion for leave to file a motion for new trial, Hawk argued he was unavoidably prevented from discovering the evidence of Jywaun's arrest and that such evidence demonstrates both that the state improperly withheld exculpatory evidence and that Detective VanVorhis perjured himself.

{¶ 16} As a threshold matter, we consider the application of res judicata to this case. "The doctrine of res judicata 'prevents repeated attacks on a final judgment and applies to issues that were or might have been previously litigated.' " *State v. Russell*, 10th Dist. No. 06AP-498, 2006-Ohio-6221, ¶ 12, quoting *State v. Sneed*, 8th Dist. No. 84964, 2005-Ohio-1865, ¶ 16. As this court has stated, "[r]es judicata applies to Crim.R. 33 motions for new trial." *State v. Braden*, 10th Dist. No. 17AP-321, 2018-Ohio-1807, ¶ 11, citing *State v. Waddy*, 10th Dist. No. 15AP-397, 2016-Ohio-4911, ¶ 40, citing *State v. Russell*, 10th Dist. No. 04AP-1149, 2005-Ohio-4063, ¶ 6-7; *State v. Fox*, 10th Dist. No. 08AP-704, 2009-Ohio-1327, ¶ 7 (the doctrine of res judicata bars re-litigation of issues in a motion for leave to file a delayed motion for new trial when those issues were or could have been addressed in earlier court proceedings). *See also State v. Hill*, 8th Dist. No. 108250, 2020-Ohio-102, ¶ 36 (" '[r]es judicata bars all subsequent new trial motions that are based on claims that were brought or could have been brought on direct appeal or in prior motions filed under Crim.R. 33' "), quoting *State v. Williamson*, 8th Dist. No. 107117, 2019-Ohio-1985, ¶ 14.

{¶ 17} Here, in addition to his direct appeal, Hawk previously filed a motion for leave to file a delayed motion for new trial. Though Hawk filed more documentation in support of his second motion for leave, Hawk does not explain how the matters raised in the instant second motion for leave could not have been raised in his first motion for leave. *See Russell*, 2006-Ohio-6221, at ¶ 12 (where an appellant previously filed a direct appeal and a prior motion for new trial, the trial court does not abuse its discretion in denying appellant's successive motion for new trial on the grounds of res judicata).

{¶ 18} Hawk's argument in support of both his first and second motions for leave is that the evidence of Jywaun's arrest demonstrates that Detective VanVorhis perjured himself in his testimony when he stated that Jywaun never provided an in-person statement to police. However, in Jywaun's second affidavit filed along with the second

motion for leave, Jywaun avers that when he turned himself into police, he "almost immediately told [the detective] that [he] did not want to make a statement at that time but that [he] was the one [the detective had] spoke with before on the phone." (Feb. 2, 2021 Jywaun's Second Aff. at 1.) Thus, though Hawk filed more thorough documentation in support of his second motion for leave, the documents, themselves, do not demonstrate that Detective VanVorhis perjured himself in his testimony.

{¶ 19} Moreover, we need not decide the question of whether the evidence provided in support of Hawk's second motion for leave would satisfy the Crim.R. 33(A) standard for a new trial because, under the two-step process for an untimely motion for new trial, Hawk fails to first establish, pursuant to Crim.R. 33(B), that he was unavoidably prevented from discovering the evidence of Jywaun's arrest within the applicable time frame. Jywaun's second affidavit states that his arrest and arraignment were broadcast on the news, and Hawk testified at trial that he saw the news report of Jywaun's arrest. Additionally, after Jywaun's release from custody but prior to Hawk's trial, the state filed supplemental discovery of a DVD interview of Jywaun and audio recordings of Jywaun's jail phone calls. We also note, as the trial court did when it denied Hawk's first motion for leave, that Jywaun is Hawk's brother and was present at Hawk's trial. Thus, Hawk does not establish he either had no knowledge of Jywaun's arrest or could not have learned of Hawk's arrest with the exercise of due diligence within the applicable Crim.R. 33 time frame. *Bethel* at ¶ 13.

{¶ 20} Similarly, to the extent we construe Hawk's motion as one under Crim.R. 33(A)(2), Hawk does not establish that he was unavoidably prevented from learning of the prosecutor's alleged withholding of exculpatory evidence such that he could not have filed his motion for new trial within 14 days of the jury's verdict. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "To prove a *Brady* violation, a defendant must establish that: (1) the prosecution withheld evidence; (2) the defense *was not aware of the evidence*; and (3) the evidence withheld was material and exculpatory." (Emphasis added.) *State v. Zeune*, 10th Dist. No. 13AP-147, 2013-Ohio-4156, ¶ 18, citing *State v. Monroe*, 10th Dist. No. 04AP-658, 2005-Ohio-5242, ¶ 17. Thus, there can be no *Brady* violation where the defendant was aware of the evidence allegedly

withheld. *Zeune* at ¶ 19 ("a *Brady* violation involves the post-trial discovery of information that was known to the prosecution, *but unknown to the defense*") (emphasis sic). As we explained above, the record indicates Hawk had knowledge of Jywaun's arrest at the time of his trial. Thus, the trial court did not abuse its discretion in concluding Hawk did not establish he was unavoidably prevented from filing a motion for new trial under Crim.R. 33(A)(2) within 14 days of the jury's verdict.

{¶ 21} Accordingly, even if we were to find that res judicata did not operate to bar Hawk's second motion for leave, we nonetheless conclude the trial court did not abuse its discretion in concluding that Hawk did not demonstrate he was unavoidably prevented from discovering the evidence of Jywaun's arrest or of learning of the prosecutor's alleged misconduct. Therefore, the trial court did not abuse its discretion in denying Hawk's second motion for leave to file a delayed motion for new trial. We overrule Hawk's sole assignment of error.

## IV. Disposition

{¶ 22} Based on the foregoing reasons, the trial court did not abuse its discretion in denying Hawk's successive motion for leave to file a delayed motion for new trial. Having overruled Hawk's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, P.J., and JAMISON, J., concur.