[Cite as *State v. Stevens*, 2022-Ohio-3508.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Sylvania                    Court of Appeals No.  L-21-1182

        Appellee                                          Trial Court No.  CRB2100621

v.

Ryan Stevens                                       **DECISION AND JUDGMENT**

        Appellant                                        Decided:  September 30, 2022

* * * * *

Daniel C. Arnold, City of Sylvania Prosecuting Attorney, for appellee.

Nathan VanDenBerghe, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Ryan Stevens, appeals the September 29, 2021 judgment of the
Sylvania Municipal Court sentencing him for a misdemeanor conviction of domestic
violence.  For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} On April 8, 2021, following a report from the victim in this case, S.S., deputy Stephanie Meinke of the Lucas County Sheriff's Office filed a complaint charging Stevens with one count of domestic violence in violation of R.C. 2919.25(C), a fourth-degree misdemeanor. The complaint alleged that Stevens "did knowingly cause a family or household member to believe that imminent harm would occur by stating he was going to smash [S.S.'s] face in. * * * This did occur at [S.S.'s] home * * *."

{¶ 3} Stevens's case was tried to the court on May 12, 2021. Appellee, the city of Sylvania, presented the testimony of S.S. and Meinke. Stevens also called Meinke as his witness. The following facts were elicited at trial.

{¶ 4} S.S. testified that she and Stevens were married, but had been separated since mid-February of 2021 and were in the process of divorcing.

{¶ 5} The incident that was the basis of the charge against Stevens happened on March 24, 2021. That day, S.S. met Stevens at a Wal-Mart store to purchase groceries for him, which she was required to do as part of the divorce proceedings. According to S.S.,

> as soon as I walked in he started making comments, um, cursing at me in public * * *. Walking out to the car, um, he's still, I don't—running his mouth for lack of better terms. * * * [T]hat's when he told me that he was going to smash my face in. And I remember I turned around and I was,

2.

I was shocked to be honest at what was said but I think I was more hurt by it, I am the mother of his child. Um, and he said no, no, no, you'll just call the cops so I'll tell you it'll be somebody that you don't know that I know so it will be the element of surprise. That scared me * * *.

S.S. said the incident at Wal-Mart ended when she got into her car to leave.

{¶ 6} However, S.S. was also required to purchase gasoline for Stevens as part of the divorce proceedings, so she followed him to a gas station when they finished at Wal-Mart. S.S. called her cousin, who was on the phone with S.S. when Stevens made the threat and who lived nearby, and asked her cousin to meet her at the gas station because she "d[id]n't want to do this by [her]self." The cousin called S.S.'s father, who also went to the gas station. S.S. was able to pay for the gas and leave without incident.

{¶ 7} After March 24, S.S. said that issues with Stevens were "just constant, the harassment got worse." These contacts with Stevens were "all over the phone or text messages, * * *" and "seemed to get more harmful for his own life." Stevens was sending S.S. messages "every 35 minutes or hour * * * that would take four minutes to read * * *." At one point, while S.S. was out at a movie with a friend, she received text messages from Stevens telling her that he knew where she was and who she was with. These messages made her "fearful" and "very scared." Although Stevens did not make any specific threats of harm to S.S. other than the March 24 threat to have someone "smash [her] face in[,]" she still believed that she was at risk of harm from Stevens.

3.

{¶ 8} On April 7, S.S. received "another crazy long" text message from Stevens that was "all over the places [sic]," which is what prompted her to call the police.

{¶ 9} On cross-examination, S.S. said that she was "scared," "in disbelief," and "shocked" when Stevens made the comment about smashing her face in. Even after Stevens had threatened her, S.S. went with him to purchase gas because "[t]hat's [sic] was the agreement we came to [and] I don't go back on my word."

{¶ 10} When S.S. made her report on April 7, S.S. said that she told Meinke about the incident at Wal-Mart and about the threatening text messages. She did not show Meinke the messages, however, because Meinke did not ask to see them. S.S. could not recall the last time that Stevens made a threatening phone call to her, but said that it was before April 7.

{¶ 11} S.S. said that she did not specifically tell Meinke that Stevens threatened her at Wal-Mart. She denied telling Meinke that Stevens made the threat to smash her face in during a phone call. She claimed that she reported that Stevens made the threat "at a grocery store [and] it was verbal"—by which she meant that Stevens made the threat while they were communicating face-to-face.

{¶ 12} After March 24, S.S. said that she had two in-person interactions with Stevens: one when he dropped off an Easter gift for their child and one when they transferred ownership of a vehicle. S.S. was scared to meet with Stevens both times, but she had other people with her to observe Stevens's behavior.

4.

{¶ 13} When Stevens's attorney asked if S.S. had ever considered blocking Stevens's phone number, she responded, "I didn't think that was a very good thing since we were going through divorce proceedings and I didn't want him to assume or tell the courts that I was keeping him from contacting his child."

{¶ 14} Regarding S.S.'s decision to report Stevens's threat to the police, S.S. said that her parents had encouraged her to report him in the past, but she had not. She denied making the April 7 report because of advice from her divorce attorney. She also denied that they had some type of custody hearing the week after S.S. made the report; she said that they were scheduled for a Zoom call with a court counselor regarding "what was in the best interest of our child as far as visitation" on April 20, but Stevens did not attend.

{¶ 15} S.S. admitted that she called the police on April 3 to do a wellness check on Stevens because she believed, based on the content of the text messages he was sending her, that he was suicidal. She did not report to officers at that time that Stevens had threatened her. S.S. did not know what happened as a result of the wellness check.

{¶ 16} S.S.'s goal in reporting Stevens's behavior from March 24 was to get "the threats and the bothersome [sic] and the stalking and all of that to just stop." She admitted that Stevens had not made any threats of physical harm to her after March 24, but said that dealing with the constant text messages from Stevens—including his threats of self-harm and him apparently tracking her location—was "a mental torture."

5.

{¶ 17} Next, the city called Meinke to testify. On April 7, 2021, Meinke was on duty when she was called to S.S.'s house. When she arrived, she and S.S. talked while standing in the driveway, and after hearing S.S.'s version of events, Meinke decided to file a domestic violence charge against Stevens. S.S. gave Meinke the address where she believed Stevens was staying, and Meinke and her partner apprehended him without incident.

{¶ 18} On cross-examination, Meinke said that S.S. never mentioned Wal-Mart when she reported the alleged threats from Stevens. S.S. also said that she had text messages from Stevens, but Meinke did not recall S.S. saying that Stevens made the threat over the phone. Meinke did not look at the text messages that S.S. claimed to have. Stevens's attorney also had Meinke review the witness statement that S.S. wrote at the time she reported the threat, and Meinke testified that the statement did not mention either an in-person threat or Wal-Mart.

{¶ 19} Following Meinke's testimony, the state rested. Stevens moved to dismiss the charge under Crim.R. 29 on the basis that the city "has not met their burden and they've not proven every element of the charge." The city responded that S.S. testified that she and Stevens "are married, that they're currently going through a divorce, that [Stevens] threatened to smash her face in which caused her to be in fear of him and she's been living in the life of fear, * * * she's ID'd [sic] * * *" Stevens, and the threats happened within the trial court's jurisdiction. The court denied Stevens's motion because

6.

"reasonable minds can reach different conclusions as to whether each material element of the crime has been proven beyond a reasonable doubt * * *."

{¶ 20} For his case, Stevens recalled Meinke for the sole purpose of authenticating copies of body camera footage and S.S.'s 911 call. After the court admitted the exhibits, Stevens rested.

{¶ 21} On the recording of the 911 call, S.S. reported that, since filing divorce papers, Stevens had been sending her "very odd" text messages saying that he "want[ed] to harm himself, want[ed] to harm * * *" S.S., had been driving past her house, and "it seems like he knows where [S.S. is] at at all times." She said that this was "driving [her] insane" and was "taking a toll on [her] physically and mentally * * *[,]" and she was trying to get it to stop. S.S. said that her attorney told her to call the police to see if they would call Stevens to tell him to stop contacting her. If the police would not call him, S.S. wanted to pursue some type of legal action against Stevens. The most recent contact from Stevens was a text at 12:30 that morning. S.S. did not specifically mention the March 24 threat at Wal-Mart or say that Stevens had made any threats to her in person.

{¶ 22} The videos that the court admitted were from the body cameras that Meinke and her partner wore on April 7, 2021. The first video was footage from Meinke's body camera during her interview with S.S. In the video, S.S. explained that her attorney filed divorce paperwork on March 24, and since then Stevens had been texting, calling, and driving by her house. She also said that she was concerned about

7.

Stevens's mental wellbeing because she thought that he was using drugs and was suicidal, and she had requested that police do a wellness check on Stevens several days earlier. When she requested the wellness check, she asked the officers to tell Stevens to stop texting and calling her. She also told him to stop communicating with her unless it related to their child. Despite that, Stevens was continuing to text her. She said that "the only threat [she] got was over the phone * * *." In that threat, Stevens "threatened to smash [her] face in, [and] he's threatened to smash in anybody that [S.S. is] with * * *." S.S. said at least twice that Stevens made this threat during a phone call.

{¶ 23} While writing her witness statement, S.S. told Meinke that Stevens "did physically harm [her]" at some unspecified time, but she "never went to the hospital or anything * * *" and did not file charges against him. Meinke told her not to supplement her statement with that information because it was not related to the reason S.S. called the police that day. S.S. also said that Stevens had told her "not to call the cops * * *" in the most recent text message he sent her.

{¶ 24} When Meinke is reviewing S.S.'s written witness statement in the video, the video shows that S.S. wrote that Stevens "verbally" told S.S. that he would smash her face in, but S.S. did not say when Stevens made the threat or whether he made it in person or over the phone.

{¶ 25} While talking to Meinke, S.S. mentioned that she had spoken to her attorney about the situation. At one point, Meinke asked her what her attorney had

8.

advised her to do. S.S. responded that her attorney told her that some police departments will tell the other person to stop their bothersome conduct and give them a warning, but because the dispatcher told her that the sheriff's office does not do that, she wanted to file a telecommunications harassment complaint against Stevens because the situation was "driving [her] crazy * * *." S.S. did not want to block Stevens's calls (and said that her attorney advised against doing so) to avoid Stevens using that against her in the divorce proceedings. S.S. told Meinke that she and Stevens had a Zoom call with a court counselor on April 20—nearly two weeks later—regarding visitation and the best interest of their child.

{¶ 26} Meinke told S.S. that she should save any text messages that she received from Stevens, and S.S. said that she had been saving everything. Meinke ultimately told S.S. that she was going to file domestic violence charges against Stevens.

{¶ 27} The second body camera video was from the camera that Meinke's partner wore at the time he arrested Stevens. When Stevens came out of his house, the officer told him that he was under arrest for "domestic threats," and Stevens responded, "I did not threaten nobody! Dude, I didn't even threaten anybody, man. Who did I threaten?" When the officer told Stevens that he "[a]pparently" threatened his exwife, he replied, "No, I did not, dude, my phone's right there. I haven't even talked to her. * * * I didn't threaten her at all." Despite his protests, the officer was able to arrest Stevens without incident.

9.

{¶ 28} After closing arguments, the trial court took the matter under advisement.

{¶ 29} On August 25, 2021, the trial court filed its verdict finding Stevens guilty of domestic violence.[1] In its findings of fact, the court determined that S.S. called the sheriff's office on April 7 to report Stevens for "threatening her life and his own in 'constant text messages.'" S.S. met Stevens at Wal-Mart on March 24 to pay for his groceries, as she agreed to in their divorce proceedings, and Stevens began cursing at her when she walked into the store. Stevens "continued 'running his mouth' as they exited the store[,]" and once they were in the parking lot, Stevens told S.S. that he would "'smash [her] face in' and that, because she would 'just call the cops, * * * [i]t'll be somebody that [she did not] know but that [he knew]' so that there would be 'the element of surprise.'" (Brackets and ellipsis sic.) S.S. was scared, shocked, and terrified[2] by Stevens's comments. S.S. asked her cousin, who was on the phone with her when Stevens made his threat at Wal-Mart, to meet her at the gas station where she was going to purchase Stevens's gas; the cousin arrived at the gas station with S.S.'s father.

{¶ 30} Over the following days, Stevens called and texted S.S. frequently, sometimes texting as often as every 35 minutes. One time, when S.S. was at the movies

---

[1] Stevens had the right to be present for the verdict unless waived, as provided by Crim.R. 43. Although there appears to be nothing in the record demonstrating waiver, Stevens does not raise this issue on appeal for our review.

[2] The trial court described S.S. as "terrified" in its verdict, but S.S. did not use that term in her testimony, the 911 call, or while talking to Meinke.

with a friend, Stevens texted her saying that "he 'knew where [she] was' and 'who [she] was] with[,]'" which made S.S. "'very scared'* * *." (Brackets sic.) The trial court found that "[u]pon waking up to a 'crazy long' text that was 'all over the place' on April 7, 2021, [S.S.] decided to contact the police because she could not live like that any longer." S.S. believed that she was at risk of harm from Stevens.

{¶ 31} The court also recapped Stevens's cross-examination of S.S. The court noted that S.S. did not contact police on March 24, but said that she should have called that day, and she thought about calling before she ultimately reported the March 24 threat on April 7. Stevens did not make any threats of physical harm to S.S. after March 24, although he "ma[d]e many different threats, some against his own life and some against hers[,]" in texts and phone calls between March 24 and April 7. S.S. admitted that she had met Stevens twice after the incident at Wal-Mart, once when he brought their child an Easter gift and once when they transferred the title to a vehicle. She was scared to meet with him each time, but other people that she knew were present when Stevens was around. The court also noted that Stevens "attempted to show that [S.S.] had contacted the sheriff's office on April 7, 2021, in an attempt to impugn his character in the eyes of the divorce court. [S.S.] denied this allegation."

{¶ 32} Regarding Meinke's testimony, the court noted only that Meinke went to S.S.'s house, spoke to S.S. in her driveway, and arrested Stevens after speaking to S.S. She testified that S.S. did not tell her that Stevens made his threat at Wal-Mart, but later

11.

testified that S.S.'s version of events did not change from April 7 to the day of trial. The court did not discuss the contents of the body camera footage or the 911 call.

{¶ 33} Based on those facts, the trial court found that the city "proved beyond a reasonable doubt that [Stevens] had, by threat of force, knowingly caused [S.S.] to believe that he would cause imminent physical harm to her[,]" and found Stevens guilty. The court explained that a violation of R.C. 2919.25(C) requires proof that, at the time the threat was made, the victim believed that the defendant desired to harm her and that he intended to act on that desire, and that the threat was ready to take place, near at hand, or impending and unconditional or non-contingent. The court found that S.S.'s testimony satisfied these requirements.

{¶ 34} Moreover, the court found that S.S.'s willingness to be in the same location as Stevens (notably, while other adults were also in the area) following the threat on March 24 was not probative of whether S.S. feared harm at the time Stevens made the threat on March 24. The court also discounted Stevens's attempt to show that S.S. called the police to gain an advantage in the parties' divorce and custody proceedings because S.S.'s unrebutted testimony was that the divorce was uncontested and that custody had been determined before April 7. Finally, the court determined that S.S.'s delay in reporting the threat to the police did not show that the city failed to prove that S.S. was in fear of imminent physical harm because of Stevens's continuing course of conduct from March 24 to April 7 "created a threat that hung 'threateningly over' [S.S.'s] head."

12.

{¶ 35} The trial court sentenced Stevens to 30 days in jail, with 25 days suspended, two years of probation, no contact with S.S., a fine, and court costs.

{¶ 36} Stevens now appeals, raising four assignments of error:

> I: The evidence presented at Appellant's trial was insufficient to support the conviction[.]

> II: The Trial Court's [sic] erred when it denied Appellant's Rule 29 Motion[.]

> III: The Trial Court's [sic] erred when it used a sufficiency of the evidence standard to convict Appellant rather than the Constitutional beyond a reasonable doubt standard[.]

> IV: The Trial Court's finding of guilty was against the manifest weight of the evidence[.]

## II. Law and Analysis

### A. The trial court found Stevens guilty by proof beyond a reasonable doubt.

{¶ 37} We first address Stevens's third assignment of error. In it, he argues that his due process rights were violated because the trial court used a sufficiency-of-the-evidence standard to find him guilty of domestic violence rather than the beyond-a-reasonable-doubt standard required in criminal cases. The city responds that Stevens's argument ignores the portion of the trial court's verdict where the court specifically stated that the city proved each element of the charge against Stevens beyond a reasonable

13.

doubt, and that a plain reading of the verdict shows that "the trial court found that the [city] presented evidence sufficient to find [Stevens] guilty beyond a reasonable doubt, not that the court used the incorrect standard."

{¶ 38} "It is axiomatic that the [prosecution] must prove each and every element of an offense beyond a reasonable doubt." *State v. Jones*, 91 Ohio St.3d 335, 347, 744 N.E.2d 1163 (2001). Here, after reviewing the evidence presented at trial, the trial court clearly and plainly stated in its verdict that the city "proved beyond a reasonable doubt that [Stevens] had, by threat of force, knowingly caused [S.S.] to believe that he would cause imminent physical harm to her." In other words, the trial court found that the city had proven each element of a violation of R.C. 2919.25(C) beyond a reasonable doubt.

{¶ 39} The statement that Stevens takes issue with—i.e., that the city "presented sufficient evidence to show that [Stevens] knowingly threatened [S.S.] with imminent physical harm"—was at the end of the trial court's legal analysis relating to the imminence of the threat that Stevens made. When this statement is read in context, nothing indicates that the court used the phrase "sufficient evidence" as a legal term of art. That is, the court did not consider whether Stevens's threat against S.S. was imminent under the standard that an appellate court uses when reviewing a conviction for sufficiency of the evidence, as Stevens contends. Rather, the court meant that the city presented the necessary *quantum* of evidence to meet its burden of proving the imminence of the threat. At worst, the trial court's use of the phrase "sufficient

14.

evidence" was a matter of imprecise word choice; it was not an indication that the court found Stevens guilty based on a standard of proof lower than proof beyond a reasonable doubt.

{¶ 40} Stevens's third assignment of error is not well-taken.

### B. Stevens's conviction is supported by sufficient evidence.

{¶ 41} In his first and second assignments of error, Stevens raises challenges to the sufficiency of the evidence. In his first assignment of error, he argues that his conviction is not supported by the evidence, and in his second assignment of error, he argues that the trial court erred by denying his Crim.R. 29 motion. In support of both assignments of error, Stevens argues that his conviction is unsupported by the evidence because any threat that he made to S.S. was not "imminent" within the meaning of R.C. 2919.25(C). The city responds that the nature of the threat, and Stevens's continued harassment of S.S. following the threat, support the trial court's finding of imminence.

{¶ 42} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, we will not weigh the evidence or assess the credibility of the witnesses. *State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a

15.

conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 43} A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. Thus, the denial of a Crim.R. 29 motion "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 44} Stevens was convicted of domestic violence under R.C. 2919.25(C), which requires the city to prove that the defendant, by threat of force, knowingly caused a family or household member to believe that the defendant would cause imminent physical harm to the family or household member. "Force" is "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). A defendant acts "knowingly" when, regardless of his purpose, he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). A spouse or former spouse who has resided with the defendant is a "family or household member." R.C. 2919.25(F)(1)(a)(i). "Physical harm" includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 45} Two of the terms in R.C. 2919.25(C) are not defined by statute: "threat" and "imminent." The Ohio Supreme Court has said that the term "threat" "represents a

16.

range of statements or conduct intended to impart a feeling of apprehension in the victim * * *." *State v. Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, 858 N.E.2d 341, ¶ 39; *State v. Binks*, 12th Dist. Butler No. CA2017-08-118, 2018-Ohio-1570, ¶ 62. A threatening communication does not become less of a threat based on the method the defendant uses to deliver it. That is, "'there are a multitude of methods by which criminal threats may be conveyed: phone, pager, e-mail, blog, Twitter, Facebook, and so forth. A threat made to and subsequently delivered by a third party to the intended victim can cause the same belief of potential harm as a direct threat, and is no less a crime.'" *State v. Sexton*, 11th Dist. Geauga No. 2021-G-0027, 2022-Ohio-1461, ¶ 52, quoting *Cleveland v. Hernandez*, 163 Ohio Misc.2d 37, 2011-Ohio-3394, 950 N.E.2d 1040, ¶ 9 (M.C.). Thus, "the fact that [the defendant's] communications were electronic is inconsequential * * *" to a finding that the communications constituted a threat for purposes of R.C. 2919.25(C). *Id.*

{¶ 46} The issue of what constitutes an "imminent" threat under R.C. 2919.25(C) is less clear-cut. The Supreme Court has not addressed this issue. In the only case in which we addressed the matter in any depth, we adopted the definition of imminent used by the Second District: "'near at hand or impending[,]'" or "'the belief of the victim that harm would occur immediately or, in the alternative, that the defendant will cause immediate physical harm.'" *State v. Race*, 6th Dist. Sandusky No. S-16-018, 2017-Ohio-612, ¶ 15, quoting *State v. Fisher*, 197 Ohio App.3d 591, 2011-Ohio-5965, 968 N.E.2d 510, ¶ 17 (2d Dist.). We did not devote much of our analysis in *Race* to the definition of

17.

imminent because our decision did not depend on the immediacy of the threat; it hinged on the conditional nature of the threat. *See Race* at ¶ 15-19 (the defendant threatened to harm the victim *only if* the victim took a certain action, and conditional threats, standing alone, are generally not imminent within the meaning of R.C. 2919.25(C)).

{¶ 47} Other districts have considered the meaning of imminent in more depth and crafted a more robust definition. The trial court in this case primarily relied on the definition used in *State v. Tackett*, 4th Dist. Jackson No. 04CA12, 2005-Ohio-1437. In *Tackett*, the court defined "imminent" as "ready to take place," "near at hand," "impending," "hanging threateningly over one's head," or "menacingly near." (Internal quotations omitted.) *Id.* at ¶ 14, citing *Strong v. Bauman*, 2d Dist. Montgomery Nos. 17256 and 17414, 1999 WL 317432 (May 21, 1999). The Fourth District said that imminent did not mean that the defendant would "carry out the threat immediately or be in the process of carrying it out." (Internal quotations omitted.) *Id.*, citing *Henry v. Henry*, 4th Dist. Ross No. 04CA2781, 2005-Ohio-67. The "critical inquiry" is "whether a reasonable person would be placed in fear of * * * unconditional, non-contingent * * * physical harm * * *." (Last ellipsis sic and internal quotations omitted.) *Id.*, citing *Henry* at ¶ 19; and *State v. Taylor*, 79 Ohio Misc.2d 82, 85, 671 N.E.2d 343 (M.C.1996). A threat can be imminent even when the defendant specifically tells the victim that "she [will] not know the day, time or place he [will] carry through on that threat." *State v. McClelland*, 10th Dist. Franklin No. 01AP-630, 2002 WL 356306, *5 (Mar. 7, 2002); *see*

18.

*also Sexton* at ¶ 42-44 ("imminent" does not "equate[] to a temporal element of physical harm").

{¶ 48} In addition to each of the statutory elements, "[t]he victim's state of mind is an essential element of domestic violence under R.C. 2919.25(C)." *State v. South*, 2d Dist. Champaign No. 2017-CA-34, 2018-Ohio-4146, ¶ 13, citing *Fisher* at ¶ 16. To prove the victim's state of mind, the prosecution is required to present either (1) some evidence that the victim *said* that she thought the defendant would cause her imminent physical harm, or (2) evidence that allows the factfinder to *infer* the victim's state of mind. *State v. Baker*, 12th Dist. Butler No. CA2020-08-086, 2021-Ohio-272, ¶ 13, citing *Hamilton v. Cameron*, 121 Ohio App.3d 445, 449, 700 N.E.2d 336 (12th Dist.1997). As the Second District explained in *Fisher*, the prosecution does not have to prove that "the victim believed she would *suffer* imminent physical harm"; the prosecution's burden is to show that "the victim believed that the defendant *desired to harm* her and that he *intended to act* on that desire." (Emphasis added.) *Fisher* at ¶ 31; *see also State v. Schweitzer*, 2015-Ohio-925, 30 N.E.3d 190, ¶ 47 (3d Dist.) (Willamowski, J., dissenting) (Collecting cases to support the contention that "[c]ases reviewing the belief of imminent physical harm element under R.C. 2919.25(C) focus on the victim's state of mind. * * * Therefore, the victim's testimony that she believed she would suffer imminent physical harm constitutes evidence of imminence." (Internal citations and quotation omitted.)).

19.

The victim's fear of imminent physical harm must exist at the time the defendant makes the threat. *State v. Marshall*, 2017-Ohio-9269, 103 N.E.3d 61, ¶ 11 (12th Dist.).

{¶ 49} Here, it is undisputed that S.S. and Stevens were married and had resided together, making them family or household members. At trial, S.S. testified that Stevens said that he was going to "smash [her] face in[,]" but, because S.S. would "just call the cops * * *[,]" he would accomplish this through "somebody that [S.S.] d[id]n't know that [Stevens] know[s] so it will be the element of surprise." If S.S.'s testimony is believed, a rational trier of fact could find that Stevens's statement was a threat of force because it was a statement of violence that was "intended to impart a feeling of apprehension in the victim." *Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, 858 N.E.2d 341, at ¶ 39; R.C. 2901.01(A)(1). This statement also threatened physical harm to S.S. R.C. 2901.01(A)(3).

{¶ 50} Regarding S.S.'s state of mind, she testified that she was "scared," "shocked," and "hurt" at the time of the incident. Notably, however, S.S. did not specifically testify that that she believed that Stevens desired to harm her or intended to act on that desire. But, we can infer from S.S.'s fear and her testimony—most notably, that she asked her cousin (who was on the phone with S.S. at the time Stevens made the threat) to meet her at the gas station while she purchased gas for Stevens so that she was not alone with him—that S.S. believed that Stevens desired to harm her and intended to act on that desire.

20.

**{¶ 51}** A rational trier of fact could also find that Stevens's threat of physical harm to S.S. was imminent. We agree with the Fourth District that "imminent" can include a statement that is "hanging threateningly over one's head," but still places "a reasonable person * * * in fear of * * * unconditional, non-contingent * * * physical harm * * *." (Last ellipsis sic and internal quotations omitted.) *Tackett*, 4th Dist. Jackson No. 04CA12, 2005-Ohio-1437, at ¶ 14. This is precisely the type of threat that Stevens made to S.S. Because Stevens's threat was unconditional, it is of no consequence that he told S.S. that there would be an "element of surprise" to the attack and she would not know when or where it was coming. *McClelland*, 10th Dist. Franklin No. 01AP-630, 2002 WL 356306, at *5. Threats are not required to have a temporal element. *Sexton*, 11th Dist. Geauga No. 2021-G-0027, 2022-Ohio-1461, at ¶ 42-44.

**{¶ 52}** Additionally, because we do not weigh the evidence or consider credibility when analyzing the sufficiency of the evidence, the discrepancies between S.S.'s testimony and her report to Meinke do not affect our conclusion that the verdict is supported by sufficient evidence. Thus, based on the evidence admitted at trial, when viewed in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of domestic violence under R.C. 2919.25(C) proven beyond a reasonable doubt. Accordingly, Stevens's first and second assignments of error are not well-taken.

21.

**C. Stevens's conviction is not against the manifest weight of the evidence.**

{¶ 53} In his fourth assignment of error, Stevens argues that his conviction is against the manifest weight of the evidence because S.S.'s testimony was contradictory and lacked credibility. Specifically, he points to S.S. claiming at trial that Stevens threatened her in person, but reporting to Meinke that he threatened her over the phone, and testifying that she decided to call the police on her own, but telling Meinke that her divorce attorney had advised her to call the police.

{¶ 54} Although the city admits that S.S.'s testimony contains some inconsistencies, it argues that these show "a mistake about one threat in the midst of a tumultuous number of days * * *" and the "breakdown of [Stevens and S.S.'s] relationship over a period of time rather than the implication that she made up the threat * * *[,]" and that the inconsistencies should not strip S.S. of all credibility. The city contends that this is not an exceptional case where the evidence weighs heavily against the conviction.

{¶ 55} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as

22.

a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 56} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the trial court's credibility determinations, given that it is the trial court that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The trial court, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 6th Dist. Wood No. WD-07-009, 2008-Ohio-1557, ¶ 62, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 57} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. To be sure, S.S. had credibility issues. Most glaringly, her account of the manner in which Stevens delivered his threat

differed significantly between her report to Meinke and her trial testimony (i.e., over the phone versus in person). But the content of the threat was the same; S.S. always said that Stevens threatened to smash her face in. Additionally, S.S.'s testimony about whether and to what extent she discussed calling the police and a criminal case against Stevens with her divorce attorney was somewhat inconsistent and at odds with some of her conversation with Meinke. Nevertheless, we must extend special deference to the trial court's credibility assessment because the trial court actually saw and heard S.S. testify. *Fell* at ¶ 14.

{¶ 58} In addition, we do not view S.S.'s decision to call the police as sinister like Stevens does. He implies that S.S., based on advice from her attorney, reported him to the police to gain an advantage in their divorce. However, it was clear from S.S.'s conversation with Meinke that S.S. reported Stevens, at least in part, to get him to stop "harassing" her by constantly calling, texting, and driving by her house. She said that she wanted officers to ask him to stop contacting her, but because that was not an option, she was filing a police report. Although S.S. also mentioned the threat to Meinke, it was not the focus of her report. In other words, S.S. did not call the police with the intent of having domestic violence charges filed against Stevens.

{¶ 59} Nonetheless, we cannot say that the trial court lost its way or created a manifest miscarriage of justice by believing S.S.'s testimony about Stevens threatening her, despite the issues with her credibility. We find, therefore, that Stevens's conviction

24.

is not against the manifest weight of the evidence.  Thus, his fourth assignment of error is not well-taken.

### III. Conclusion

{¶ 60} For the foregoing reasons, the September 29, 2021 judgment of the Sylvania Municipal Court is affirmed.  Stevens is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.          

_____

                  JUDGE

Christine E. Mayle, J.        

Gene A. Zmuda, J.           

_____

CONCUR.                         JUDGE

_____

                  JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.