[Cite as *Toledo v. Blade*, 2023-Ohio-658.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                           Court of Appeals No.  L-22-1091

     Appellee                                      Trial Court No.  CRB-22-00731

v.

Henry E. Blade                                  **DECISION AND JUDGMENT**

     Appellant                                     Decided:  March 3, 2023

* * * * *

Rebecca Facey, City of Toledo Chief Prosecuting Attorney, and
Jimmie L. Jones, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**MAYLE, J.**

## I.     Introduction

**{¶ 1}** The defendant-appellant, Henry Blade, was convicted in the Toledo

Municipal Court of domestic violence and resisting arrest and sentenced to serve 40 days

in jail.  On appeal, Blade argues that the judgments must be overturned because the

evidence does not support his domestic violence conviction and because the state failed

to produce exculpatory evidence.  As set forth below, we affirm.

## I. Background

{¶ 2} Blade and "A.B.," the victim in this case, were in a relationship and share a young son together. In early December of 2021, A.B. asked Blade to move out of her Burton Avenue home in Toledo. According to A.B., Blade's behavior "drastically changed," after he stopped taking his medication used to treat his mental health conditions. For example, Blade became "very aggressive towards men" by picking fights in public, and also became "infatuate[ed]" about getting his "felonies * * * expunged [s]o that he [could] get a weapon." A.B. "could not take it anymore" and felt "very concerned" and "nervous for [her] children" when Blade was around.

{¶ 3} In early January of 2022, A.B. was granted a civil protection order ("CPO") from the domestic relations court. According to A.B., the CPO ordered Blade not to "threaten" or "cause physical harm" to A.B., but it did not prohibit him from contacting her or speaking with her. And indeed, A.B. continued to allow Blade to visit their son in her home, even after the CPO went into effect. During one such visit, however, an "altercation" ensued after A.B. told Blade that it was time for him to go. In response, Blade "threw a kitchen glass and shattered it in the family room" and took A.B.'s "Xbox" and "threw it in the kitchen sink and turned the water on." A.B. filed a police report the next day.

{¶ 4} As a result of that incident, "when [Blade] called [A.B.] * * * a few evenings later," on January 21, 2021, she did not answer her phone. Later though, when

2.

she was "at home and settled," A.B. took his call. A.B. told Blade that "him coming over was not a good idea anymore." A.B. described Blade's response as follows:

> [A]ll, [he said was], if you don't want me to come over and see your son, I promise you'll end up in jail and lose your job, or you'll end up dead. And then he used some cuss words, and I didn't even continue the conversation with him. I just immediately hung up. And at that point, I called the police. Because I didn't know at any point he could have showed up at my house.

{¶ 5} Officer Paige Benson, of the Toledo Police Department, and her partner were dispatched to A.B.'s home that night. During the fifteen-minute visit, Officer Benson witnessed A.B.'s cell phone "go off * * * continually * * * over and over and over again." Each time it did, a man's picture appeared on A.B.'s cell phone, whom A.B. identified to police as Blade. At trial, Officer Benson also identified Blade as the person who appeared on A.B.'s phone that night.

{¶ 6} A criminal complaint was filed against Blade, charging him with domestic violence, in violation of R.C. 2919.25(C), and menacing, in violation of R.C. 2903.22, both misdemeanors of the fourth degree, and a warrant was issued for his arrest. The police also filed, on A.B.'s behalf, a motion for a temporary protection order ("TPO") against Blade.

3.

{¶ 7} Three days later, around 11:30 p.m. on January 24, 2022, the police located a maroon Chevy Blazer, registered in Blade's name, that was parked in an empty lot of the Toledo Public Library on Sylvania Avenue. Officer Amber O'Connell was one of three officers who were called to serve the warrant. She testified that, as police approached the vehicle, Blade appeared to be asleep in the driver's seat. The lead officer knocked on Blade's car window and advised him, "[t]hrough the window" that there were "warrants for his arrest." Blade awoke and responded that he "had no warrants" and "wasn't getting out the vehicle." Blade appeared to be "irate" and "immediately upset" that the police were there "knocking on his window," and he continued "hollering" and "yelling" that he did not have any warrants and was not getting out of his vehicle. Police told Blade "numerous times," that "we're here for a warrant. That's it. Just get out of the vehicle. That's all we're here for." Blade's "vehicle door was [then] opened" and Blade "was advised * * * to stay in the vehicle." When Blade "reach[ed]" for something "on his right side," police told him, "don't reach." The lead officer then "t[ook] him out of the vehicle" and "escorted [him] by the arm onto the ground," while Officer O'Connell and her partner "assisted in handcuffing" him. At that time, Blade was served with the arrest warrant in the domestic violence and menacing case (TMC case No. 22-CRB-644). He was also charged with resisting arrest, in violation of R.C. 2921.33, a misdemeanor in the second degree (TMC case No. 22-CRB-731).

4.

{¶ 8} A hearing was held on January 26, 2022, on the issue of A.B.'s motion for a TPO.  A.B. testified that Blade called her phone "over 70 times" and left "two dozen" voice mails, some of which were "nice" and some of which were "angry."  Over the objection of his counsel, Blade also testified.  Much of Blade's examination on the witness stand was conducted by the trial court.  At the conclusion of the hearing, the court indicated it was "very concerned" that Blade was "not in full control of [his] emotions" and that he was "dangerous."  The court granted A.B.'s request for a TPO and entered a not guilty plea on Blade's behalf.

{¶ 9} A bench trial, as to both cases, was held on March 2, 2022.  A.B. and Officers Benson and O'Connell, whose testimony is described above, testified on behalf of the state.  After the state rested its case, the defense moved for an acquittal, which the court denied.  Blade then testified in his own defense.

{¶ 10} Blade described himself as "homeless" and living out of his car.  When A.B. forced Blade to move out in December, he began "camping out" in his car, which he parked "across the street from [A.B.'s] residence * * * on Burton Avenue."

{¶ 11} With regard to the charges related to his harassing and threatening phone calls, Blade testified that he did not remember having any interaction with A.B. that day, i.e. January 21, 2022.  When asked a second time, Blade testified, "[y]ou know, I [will be] honest because I took a[n] oath.  I don't remember that at all.  But I do know that [A.B.] has an app [called] Spoof," which allows the user to "make a number appear on

5.

somebody else's phone as if it was a different person calling." Blade speculated that A.B. may have used Spoof to make it appear as though he was the caller because she had done that before. And, although Blade testified a third time that he did not "remember" calling A.B. on January 21, 2022, he also claimed that he "did not call and threaten her" and had "never threatened her."

{¶ 12} As for the resisting arrest charge, Blade adamantly denied that he was asleep when the officers arrived to serve him with a warrant. Blade testified that he saw the patrol cars enter the library parking lot and then stop, temporarily, at the opposite end of the parking lot, from Blade. Blade thought that the officers were likely "waiting for [him] to run * * * because [he] knew [he] had warrants already." So, when the police drove closer to him, Blade said that he "was like, oh man. At that time, * * * [he] opened the door half way * * * [a]nd * * * proceeded to step out." Before he was "all the way out," of his vehicle, "between * * * the door and [his] seat," he heard a voice say, "'[p]ut your hands up.'" Blade did as he was instructed, and said, "[d]on't shoot." Blade described what happened next: After that, a male police officer "came to my door, opened the rest of [the] door, * * * dragged me out of my car by my locks, whiplashed my back, my side, my ankle twisted, and threw me on the ground." Blade insisted that neither of the other officers, both female, assisted in making the arrest, because he "never * * * resist[ed]." He described himself as fully "compliant."

{¶ 13} In case No. CRB-22-644, the trial court found Blade not guilty of menacing and guilty of domestic violence. It sentenced him to serve 30 days in jail, with all days suspended, and placed him on active probation for two years, subject to a number of conditions, including no contact with A.B. and compliance with any and all protective orders and all mental health requirements, as outlined by the probation department. In case No. CRB-22-731, the trial court found Blade guilty of resisting arrest and sentenced him to serve 90 days in jail, of which 50 days were suspended, plus probation. Blade appealed and assigns two errors for our review:

> **ASSIGNMENT OF ERROR I**: Body camera footage of Blade's arrest was material to his defense as it would have been independent evidence of what actually occurred and the failure of the City to turn that footage over was a prejudicial violation of *Brady v. Maryland* that requires this Court to reverse Blade's conviction.

> **ASSIGNMENT OF ERROR II**: The weight of the evidence did not support a conviction for domestic violence.

### III. Analysis

**A. There is no evidence to support Blade's claim that the state committed a *Brady* violation.**

{¶ 14} In his first assignment of error, Blade claims that the state violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.E.2d 215 (1963) by failing to "disclose the body camera footage of [his] arrest." Blade argues that such footage would have

7.

exonerated him of the resisting arrest offense and shown that Officer O'Connell "committed perjury on the stand."

{¶ 15} "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87; *See also, State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph four of the syllabus (following *Brady*).

{¶ 16} To establish a *Brady* violation, a defendant must demonstrate that: (1) the prosecution withheld evidence, (2) the defense was not aware of the evidence, and (3) the withheld evidence was material and exculpatory. *State v. Hawk*, 10th Dist. Franklin No. 21AP-265, 2021-Ohio-4533, ¶ 20. *See also State v. Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, 192 N.E.3d 470, ¶ 19, quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ("'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'").

{¶ 17} "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" falls within the *Brady* rule. (Internal quotation omitted.) *State v. Jones,* 1st Dist. Hamilton No. C-180091,

2019-Ohio-4862, ¶ 59, quoting *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

{¶ 18} Here, the trial court record contains only one reference to the officers' use of body cameras from the time of his arrest. That is, during cross examination, Officer O'Connell confirmed that she was wearing a "body cam" at that time and that it was "active." Defense counsel did not inquire further or request to see any footage from that night that *might* exist.

{¶ 19} Blade's *Brady* claim therefore fails for several reasons. First, Blade did not make any demand for discovery from the state, including any request for body camera footage, which he would have been entitled to had he requested it. Crim.R. 16(B) provides that, upon demand by a defendant, the prosecutor "shall provide copies [of] * * * (1) any written or recorded statement by the defendant; * * * [or] (5) [a]ny evidence favorable to the defendant and material to guilt or punishment." However, for *Brady* to apply, Blade must be able to show "suppression by the prosecution of evidence favorable to an accused *upon request*." (Emphasis added.) *Brady* at 87. Absent any evidence that Blade requested the evidence, much less that the state suppressed it, he cannot establish a violation under *Brady*.

{¶ 20} Moreover, since *Brady,* the United States Supreme Court has "clarified" that the *Brady* rule only applies in situations involving the discovery of exculpatory information "*after*" trial. (Emphasis in the original.) *Jones* at ¶ 59 citing *United States v.*

9.

*Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The Ohio Supreme Court "followed suit" in *State v. Wickline*, 50 Ohio St.3d 114, 116, 552 N.E.2d 913 (1990), which held that where "alleged exculpatory records [are] presented *during* the trial, there exists no *Brady* violation requiring a new trial." (Emphasis in the original.) *Id.; compare State v. Aldridge,* 120 Ohio App.3d 122, 146, 697 N.E.2d 228 (2d Dist.1997) (Interpreting *Brady* and finding that the rule "applies only to material discovered *after trial* because the defendant, if he chooses to, can generally ensure that material discovered prior to or during trial will be entered into evidence and is, thus, not substantially prejudiced") (Emphasis added).

{¶ 21} In this case, because Blade learned of the possibility that exculpatory evidence could exist *during* the trial, there was no *Brady* violation. *Accord State v. Beaver,* 5th Dist. Trumbull No. 2011-T-0037, 2012-Ohio-871, ¶ 45 ("Because the photo was presented during trial, there could be no *Brady* violation in this case. Appellant's suggestion that the rule in *Brady* requires a mistrial is therefore misplaced."); *Jones* at ¶ 61 ("[E]ven if promises were made [to witnesses who testified at trial] and not disclosed prior to trial, the rule in *Giglio* does not apply because the promises allegedly made were discovered during trial and [the defendant] had the ability to recall [them] and get the impeachment material into evidence."); *State v. Steele*, 5th Dist. Delaware No. 2011-CA-110, 2012-Ohio-3777, ¶ 68 ("As in *Wickline,* Steele was given access to the complete report during trial, and, therefore, a *Brady* violation did not occur. While it is unclear

10.

whether counsel looked at the report during the trial, had counsel done so when it was made available to him and believed the information therein was material, Steele could have asked the trial court to revisit the prior ruling sustaining Steel's request that the report not be admissible.").

{¶ 22} As explained by the court in *Aldridge,* the rationale for limiting *Brady* claims to those situations where the exculpatory evidence is not discovered until after the trial is that a defendant is not prejudiced where the exculpatory material is discovered before or during trial because there are other remedies available which allow the exculpatory material to be entered into evidence. Indeed, where the existence of previously undisclosed evidence becomes known at trial, a defendant may make a demand for the evidence, and "the court may ensure a fair trial by ordering inspection or discovery, granting a continuance or holding an *in camera* hearing." *State v. Goodwin,* 7th Dist. Mahoning No. 99CA220, 2001 WL 1740065, *14, citing *State v. Green*, 90 Ohio St.3d 352, 372 (2000); *See also* Crim.R. 16(L) ("The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."). In short, Blade may not now complain about the

state's failure to produce allegedly exculpatory evidence when he passed upon the opportunity to rectify the issue during the trial.

{¶ 23} Finally, we note that, even though Officer O'Connell's body camera may have been "active" at the time of Blade's arrest, there is no evidence that any *footage* from her body camera actually exists. Indeed, in his brief, Blade merely speculates that "body worn cameras are common for all officers now-a-days." "Implicit within the first element of a *Brady* claim is that the evidence allegedly withheld must have actually existed." *State v. Black*, 10th Dist. Franklin No. 22AP-180, 2022-Ohio-3119, ¶ 19-22, fn. 2, *appeal not allowed,* 168 Ohio St. 3d 1474, 2022-Ohio-4380, 199 N.E.3d 550 ("A defendant may allege a *Brady* violation based upon the loss or destruction of exculpatory evidence; however, in those cases the evidence must have actually existed at some point."). Here, Blade cannot establish a *Brady* violation based solely on his unsupported assertion that exculpatory body camera footage *could have* existed without some evidence to suggest that such footage actually did exist. *Accord Black* at ¶ 21.

{¶ 24} For all of these reasons, Blade's argument that he was denied due process due to nondisclosure of body camera evidence by the state is without merit. Accordingly, we overrule Blade's first assignment of error.

## B. Blade's conviction for domestic violence is not against the manifest weight of the evidence.

{¶ 25} In his second assignment of error, Blade argues that his conviction for domestic violence was against the manifest weight of the evidence.

12.

{¶ 26} When we review a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 27} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the trial court's credibility determinations, given that it is the trial court that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The trial court, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v.*

*Caudill*, 6th Dist. Wood No. WD-07-009, 2008-Ohio-1557, ¶ 62, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 28} Here, Blade argues that his conviction for domestic violence is against the manifest weight of the evidence because (1) "A.B. admitted that she did not feel she was in imminent danger but instead she testified that he 'could' harm her," and (2) Blade had no access to a firearm and "has no prior convictions for weapons charges so it is also unreasonable to believe that Blade would harm her with a weapon."

{¶ 29} Blade was convicted of violating R.C. 2919.25(C), which provides that, "[n]o person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member." The definition of "[p]hysical harm," as used in the domestic violence statute, includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). The term "imminent" is not defined by statute. Recently, this court discussed that term at length, and we "agree[d]" with the "robust definition" employed by the Fourth District in *State v. Tackett,* 4th Dist. Jackson No. 04CA12, 2005-Ohio-1437, which defined 'imminent' to mean "ready to take place," "near at hand," "impending," "hanging threateningly over one's head," or "menacingly near." *State v. Stevens,* 6th Dist. Lucas No. L-21-1182, 2022-Ohio-3508, ¶ 45, quoting *Tackett* at ¶ 14. The court in *Tackett* also said that imminent does *not* mean that the defendant would "carry out the threat immediately or be in the process of carrying it out."

14.

(Internal quotations omitted.) *Id.*, citing *Henry v. Henry*, 4th Dist. Ross No. 04CA2781, 2005-Ohio-67. "Rather, the critical inquiry is 'whether a reasonable person would be placed in fear of imminent (in the sense of unconditional, non-contingent), serious physical harm * * *.'" *Id.*, quoting *Henry* at ¶ 19; *see also State v. Taylor*, 79 Ohio Misc.2d 82, 85, 671 N.E.2d 343 (M.C. 1996). Thus, a threat can be imminent even when the defendant specifically tells the victim that "she [will] not know the day, time or place he [will] carry through on that threat." *State v. McClelland*, 10th Dist. Franklin No. 01AP-630, 2002 WL 356306, *5 (Mar. 7, 2002); *see also State v. Sexton,* 11th Dist. Geauga No. 2021-G-027, 2022-Ohio-1461, at ¶ 42-44 ("imminent" does not "equate[ ] to a temporal element of physical harm").

{¶ 30} Additionally, "[t]he victim's state of mind is an essential element of domestic violence under R.C. 2919.25(C)." *Stevens* at ¶ 48, quoting *State v. South*, 2d Dist. Champaign No. 2017-CA-34, 2018-Ohio-4146, ¶ 13. "To prove the victim's state of mind, the prosecution is required to present either (1) some evidence that the victim *said* that she thought the defendant would cause her imminent physical harm, or (2) evidence that allows the factfinder to *infer* the victim's state of mind." *Id.,* citing *State v. Baker*, 12th Dist. Butler No. CA2020-08-086, 2021-Ohio-272, ¶ 13. The prosecution does not have to prove that "the victim believed she would *suffer* imminent physical harm." Rather, the prosecution's burden is to show that "the victim believed that the defendant *desired to harm* her and that he *intended to act* on that desire." (Emphasis

15.

added.)  *Id.,* quoting *State v. Fisher,* 197 Ohio App.3d 591, 2011-Ohio-5965, 968 N.E.2d 510, ¶ 31 (2d. Dist.).  The victim's fear of imminent physical harm must exist at the time the defendant makes the threat.  *Id.,* citing *State v. Marshall*, 12th Dist. Madison No. CA2016-11-031, 2017-Ohio-9269, ¶ 11.

{¶ 31} Here, Blade argues that A.B. merely testified that she was afraid of what Blade "could" do to her—and, he argues, the trial court therefore lost its way by concluding this testimony, alone, indicated a fear of *imminent* physical harm.  Blade does not accurately describe the record in this case.

{¶ 32} Blade told A.B., over the phone, that "if you don't want me to come over and see your son, I promise you'll end up in jail and lose your job, or *you'll end up dead."*  (Emphasis added.)  At trial, A.B. testified that she understood Blade to mean that "he would kill [her]."  Regarding the imminence of the threat and A.B.'s state of mind, the following exchange took place between her and the state:

Q. [D]id you feel that that was an imminent physical threat to you?

A. Not at that immediate moment.  Since he wasn't physically present.

Q. Okay.

A. But I wasn't sure of his location.  So he could have well been down the street or outside my house.  But I did take that as a threat.  That's why I called the police immediately.  * * *

Q. Okay. And were you in fear of your safety at that time?

A. Yes.

Q. And were you in fear that he could cause you physical harm?

A. Yes, ma'am.

{¶ 33} Importantly, the state did not have to prove that Blade was inside of her apartment or in a position to harm her *in that moment* because, again, "imminent" is not limited to the situation where the offender is able to "carry out the threat immediately or be in the process of carrying it out." *Tackett* at ¶ 14. Moreover, as shown above, the state did show that Blade posed an imminent threat and that A.B. perceived it as such. That is, A.B. *said* that she feared for her safety at the time of the threat because, for all she knew, Blade could have been right "outside [her] house." Certainly, the proximity of Blade, perceived or real, constitutes a threat that is "impending" or "menacingly near," such that it may be said to be "imminent." Moreover, the fact that A.B. contacted the police immediately "may serve as evidence" that A.B. believed that physical harm was imminent. *Tackett* at ¶ 15.

{¶ 34} In addition, we note that the police officer who was dispatched to A.B.'s home said that A.B. appeared to be "truly afraid * * * [that Blade's threats] could be viable." The officer observed the "shakiness [of A.B.'s] voice," her "nonstop hand gestures," and peering "past [the officers] toward the door, as if maybe [Blade] would be

17.

outside." Accordingly, we find that there was competent and credible evidence to support the trial court's conclusion that A.B. was in fear of *imminent* physical harm.

{¶ 35} Finally, Blade argues that even if A.B. feared imminent physical harm, her fear was unreasonable because Blade did not have access to a firearm and did not have any prior convictions for weapons charges. *See Stevens* at ¶ 19 (the "critical inquiry" is "whether a *reasonable* person would be placed in fear of * * * unconditional, non-contingent * * * physical harm * * *.") (Emphasis added). We disagree.

{¶ 36} A.B. testified that, in the weeks preceding Blade's threatening phone calls, his behavior "drastically changed" from the "person [A.B.] knew" to someone who was "increasingly more aggressive." Blade expressed "bizarre" and "violent" fantasies that resulted in A.B. fearing for her children. A.B. also sought legal protection, first from the domestic relations court which granted her a CPO, and then from the police, after Blade threatened her with "broken glass." The events giving rise to the domestic violence charge occurred two days after the broken glass incident. A.B. testified that she took Blade's threat seriously, especially, given that Blade was living in his car, across the street from her home. By contrast, when Blade testified, he contradicted himself repeatedly, testifying that he had no memory of threatening A.B., then suggested that she framed him, and then changed his story yet again by claiming he did not, and would never, threaten her. Accordingly, we find that there is competent and credible evidence

18.

in the record to support the trial court's conclusion that a reasonable person in A.B.'s position would have feared imminent physical harm by Blade.

{¶ 37} In sum, after carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. We find, therefore, that Blade's conviction is not against the manifest weight of the evidence. For all of the above reasons, we find that Blade's second assignment of error is not well-taken.

## IV. Conclusion

{¶ 38} For the foregoing reasons, the March 2, 2022 judgment of the Toledo Municipal Court in case No. CRB-22-0731, and the June 1, 2022 judgment of the Toledo Municipal Court in case No. CRB-22-0644, are affirmed. Blade is ordered to pay the cost of this appeal pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.          _____
                                                        JUDGE
Gene A. Zmuda, J.          

Myron C. Duhart, P.J.          _____
CONCUR.                                              JUDGE

                                                        _____
                                                        JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.